Michael ADAMS and Colleen Adams, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**AMERICAN FAMILY MUTUAL INSURANCE COMPANY, Defendant.**

No. 4:13–CV–226.

United States District Court, S.D. Iowa, Central Division.

Nov. 8, 2013.

Travis James Burk, Andrew Larry Hope, Hope Law Firm PLC, Des Moines, IA, James C. Larew, Larew Law Office, Iowa City, IA, Ronald R. Parry, Parry Deering Futscher & Sparks PSC, Covington, KY, for Plaintiffs.

Ryan P. Howell, Ross W. Johnson, Faegre Baker Daniels, LLP, Des Moines, IA, Michael S. McCarthy, Faegre Baker Daniels, LLP, Denver, CO, for Defendant.

## ORDER ON PLAINTIFFS' MOTION TO REMAND

ROBERT W. PRATT, District Judge.

On October 12, 2012, Michael Adams and Colleen Adams (the "Adamses") commenced an action against American Family Mutual Insurance Company ("American Family" or "Defendant") in the Iowa District Court for Polk County. Clerk's No. 1–1 at 5–11.[1] On January 7, 2013, the Adamses filed a Motion to Amend their state court Petition to include class claims and requests for declaratory and injunctive relief. *Id.* at 22–55. On April 18, 2013, Iowa District Court Judge Dan Wilson granted the Adamses' request to amend and simultaneously certified the matter as a class action. Clerk's No. 1–3 at 22–27.

On May 9, 2013, Judge Wilson deemed the Amended Petition to have been filed as of April 19, 2013. *Id.* at 95.

On May 15, 2013, Defendant removed the action to this Court, contending that jurisdiction is proper under the Class Action Fairness Act of 2005 ("CAFA"). Clerk's No. 1 at 1–3. The Adamses, on behalf of themselves and the now-certified class, filed a Motion to Remand the Action to state court on June 7, 2013. Clerk's No. 17. Defendant filed a resistance to the Motion to Remand on June 24, 2013. Clerk's No. 21. Plaintiff filed a Reply on July 12, 2013. Clerk's No. 26. The Court held a hearing on the Motion on August 26, 2013. Clerk's No. 35. The matter is fully submitted.

## I. FACTUAL BACKGROUND

Plaintiffs claim in their Amended Petition that they had a homeowners' insurance policy on their West Des Moines property with Defendant. Am. Pet. (Clerk's No. 1–3 at 54–83) ¶¶ 16–17. On October 17, 2011, a pipe burst in the Adamses' home, causing significant structural damage. *Id.* ¶ 18. Defendant made payment for the damages pursuant to the Adamses' insurance policy. *Id.* ¶ 21. After receiving payment, the Adamses discovered additional damage to their home, but Defendant refused to consider the additional losses. *Id.* ¶¶ 22–23. The Adamses thereafter invoked their right to an appraisal under Iowa law on October 10, 2012, but were informed by Defendant that their policy had only an arbitration clause—not an appraisal clause. *Id.* ¶¶ 26–27.

The Adamses, on behalf of themselves

1. For ease of reference, all citations to page numbers throughout this order are to CM/ ECF generated page numbers at the top, right-hand corner of each page.

and a class of Iowa Policyholders [2] (hereinafter "Plaintiffs"), assert that since 1994, Defendant has issued homeowners insurance policies and farm and ranch insurance policies in the State of Iowa that do not contain the right to appraisal guaranteed by Iowa Code § 515.109 [3] in the event of a dispute over the value or amount of loss. *Id.* ¶ 28. Rather, Plaintiffs claim Defendant has issued these policies with arbitration clauses, in direct violation of Iowa

2. The class of Iowa Policyholders is defined as: "All American Family Insureds who submitted claims for benefits under homeowners insurance policies and farm and ranch insurance policies containing binding arbitration clauses." Am. Pet. ¶ 37. The class specifically excludes: (a) all directors, officers, agents and/or employees of American Family Mutual Insurance Company; (b) plaintiffs' counsel; and (c) the judge of the Court to which this case is assigned." *Id.*

3. Iowa Code § 515.109 provides that certain types of insurance policies shall contain, among other things, the following provisions:

> *Waiver provisions.* No permission affecting this insurance shall exist, or waiver of any provision be valid, unless granted herein or expressed in writing added hereto. No provision, stipulation or forfeiture shall be held to be waived by any requirement or proceeding on the part of this company relating to appraisal or to any examination provided for herein . . . .
> *Appraisal.* In case the insured and this company shall fail to agree as to the actual cash value or the amount of loss, then, on the written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within twenty days of such demand. The appraisers shall first select a competent and disinterested umpire; and failing for fifteen days to agree upon such umpire, then, on request of the insured or this company, such umpire shall be selected by a judge of a court of record in the state in which the property covered is located. The appraisers shall then appraise the loss, stating separately actual cash value and loss to each item; and, failing to agree, shall submit their differences, only, to the umpire. An award in writing, so itemized, of any

Code § 679A.1.[4] *Id.* ¶ 29. Plaintiffs further allege that Defendant was aware it was violating Iowa law at the latest by July 10, 2012, *before* the Adamses requested an appraisal, because Defendant was "ordered by the Insurance Commissioner of the State of Iowa to remove its Arbitration Clauses from all policies issued in the State of Iowa because these clauses are in violation of Iowa law." [5] *Id.* ¶ 30.

> two when filed with this company shall determine the amount of actual cash value and loss. Each appraiser shall be paid by the party selecting the appraiser and the expenses of appraisal and umpire shall be paid by the parties equally.

4. Iowa Code § 679A.1 provides:

1. A written agreement to submit to arbitration an existing controversy is valid, enforceable, and irrevocable unless grounds exist at law or in equity for the revocation of the written agreement.
2. A provision in a written contract to submit to arbitration a future controversy arising between the parties is valid, enforceable, and irrevocable unless grounds exist at law or in equity for the revocation of the contract. This subsection shall not apply to any of the following:
   a. A contract of adhesion.
   b. A contract between employers and employees.
   c. Unless otherwise provided in a separate writing executed by all parties to the contract, any claim sounding in tort whether or not involving a breach of contract.

5. The letter Plaintiffs reference is attached to the Amended Petition as Exhibit 5. *See* Am. Pet. Ex. 5. In it, Thomas O'Meara, Bureau Chief, Product & Producer Regulation, Iowa Insurance Division, states in pertinent part:

> Thank you for your response via e-mail to Wayne Lacher regarding his request for copies of approved form filings in the State of Iowa.
> We have reviewed a copy of the policy and have determined that the arbitration language contained within violates Iowa Law (679A.1)(2). This law prohibits the use of binding arbitration within a contract of adhesion. . . . At this time we request you

Plaintiffs claim that Defendant's use of an illegal arbitration clause in its policies, its failure to include a required appraisal clause in its policies, and its failure to apprise policyholders of their right to an appraisal under Iowa law, constitutes bad faith toward them and other Iowa Policyholders. *Id.* ¶¶ 31–34. Plaintiffs, therefore, request that the Court enter the following relief: 1) a declaratory judgment "to the effect that Defendant has acted wrongfully and in violation of Iowa law by inserting the illegal binding arbitration clause into its homeowners insurance contracts and farm and ranch insurance contracts, thus depriving the Iowa Policyholders of their right to appraisal" (*id.* ¶¶ 42–45); 2) a finding that Defendant "has acted in bad faith toward each and every Iowa Policyholder who is a member of the class" (*id.* ¶¶ 46–54); 3) "a mandatory injunction requiring that Defendant advise all Class members that they had a right to appraisal of their losses, under Iowa law, when they submitted claims under their homeowners or farm/ranch insurance policies" (*id.*

¶¶ 55–56); and 4) "attorneys' fees and litigation costs in this action." *Id.* at 66.

Plaintiffs attached several exhibits to the Amended Petition: 1) the affidavit of Paul Norcia (*id.* Ex. 1), discussing insurance practices regarding appraisals and arbitration; 2) the affidavit of John Trave (*id.* Ex. 2), an American Family policyholder who received an additional $157,742.91 for losses from American Family after engaging in the appraisal process; 3) the affidavit of Nicole Young (*id.* Ex. 3), an American Family policyholder who received an additional $29,551.35 for losses from American Family after engaging in the appraisal process; 4) a "Sworn and Binding Stipulation" (*id.* Ex. 4) wherein Plaintiffs "stipulate that they will not be seeking in this action damages greater than the jurisdictional minimum set forth in [CAFA]"; and 5) the July 10, 2012 letter to American Family from Thomas O'Meara of the Iowa Insurance Division (*id.* Ex. 5). Pursuant to the Federal Rules of Civil Procedure, these exhibits are incorporated into and comprise a part of Plaintiffs' Amended Petition.[6] *See* Fed.

---

remove this language from all policies which may contain this provision. This may be done through an amendatory endorsement to policy holders at renewal and be stricken from all new policies issued.

**6.** When Plaintiffs filed their "Motion to Amend Petition at Law" in state court, they attached a copy of the proposed Amended Petition, which included the "Sworn and Binding Stipulation" exhibit, to their request. *See* Clerk's No. 1–1 at 22–55. As noted, this "Sworn and Binding Stipulation" states that Plaintiffs "will not be seeking in this action damages greater than the jurisdictional minimum set forth in [CAFA]." *Id.* at 52. It further states that Plaintiffs are requesting "[a]n Order directing that the Defendant participate in the appraisal process to resolve the dispute between the Plaintiff Class and the Defendant relating to the Plaintiff Class' claims." *Id.* Finally, the exhibit provides that "Plaintiffs will further seek an award of attorney fees and litigation costs for counsel and the Class

and stipulate that the award that is sought will not exceed $4.5 million under any circumstances." *Id.*

On May 1, 2013, after Judge Wilson granted Plaintiffs' request to amend the petition, *see* Clerk's No. 1–3 at 23, Plaintiff filed a "Post–Class Certification Sworn and Binding Stipulation." *Id.* at 34–35. This document is similar to the "Sworn and Binding Stipulation" in that it "stipulate[s] that damages will not be sought in this action greater than the jurisdictional minimum set forth in [CAFA]." *Id.* at 34. It contains two other significant changes, however: 1) Plaintiffs state that they are requesting a court order directing Defendant to "offer to each member of the Class an opportunity to participate in an appraisal process" to either "have an unsettled claim resolved" or "[f]or the purpose of reevaluating a settled claim in the event any Class member is dissatisfied with the payment made by American Family after the Class member's claim was presented"; and 2) Plaintiffs state that they

R.Civ.P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

## II. LEGAL STANDARD

Under 28 U.S.C. § 1441(a), a civil action brought in state court may be removed by a defendant to federal court if it could have been brought there originally. 28 U.S.C. § 1441(a); *Mot. Control Corp. v. SICK, Inc.*, 354 F.3d 702, 705 (8th Cir.2003). A case that is not removable when it is initially filed may be removed to federal court at a later date if the case becomes removable. *See* 28 U.S.C. § 1446(b). Here, Defendant argues that Plaintiffs' Amended Petition is removable because Plaintiffs' addition of class claims subjects the case to CAFA, which permits removal of a class action[7] to federal court when the amount in controversy "exceeds the sum or value of $5,000,000, exclusive of interest and costs."[8] *See* 28 U.S.C. §§ 1332(d)(2); 1453(b). The sole issue regarding the propriety of removal in this case is whether the amount in controversy satisfies the $5,000,000 jurisdictional threshold.

"[A] party seeking to remove under CAFA must establish the amount in controversy by a preponderance of the evidence regardless of whether the complaint alleges an amount below the jurisdictional minimum." *Bell v. Hershey Co.*, 557 F.3d 953, 958 (8th Cir.2009). "Under the preponderance standard, '[t]he jurisdictional fact ... is not whether the damages *are* greater than the requisite amount, but whether a fact finder *might* legally conclude that they are....'" *Id.* at 959 (quoting *Kopp v. Kopp*, 280 F.3d 883, 885 (8th Cir.2002)) (alteration in original). "The inquiry described is fact intensive." *Id.* Importantly, the removing party's "'burden of describing how the controversy exceeds $5 million' constitutes 'a pleading requirement, not a demand for proof. Discovery and trial come later.'" *Hartis v. Chi. Title Ins. Co.*, 694 F.3d 935, 944–45 (8th Cir.2012) (quoting *Spivey v. Vertrue, Inc.*, 528 F.3d 982, 986 (7th Cir.2008)). "Once the removing party has established by a preponderance of the evidence that the jurisdictional minimum is satisfied, remand is only appropriate if the plaintiff can establish to a legal certainty that the claim is for less than the requisite amount." *Bell*, 557 F.3d at 956 (citing

"stipulate that the total amount of damages that will be sought individually by the Plaintiffs in this case, including attorney's fees and litigation costs, will not exceed $4.9 million under any circumstances." *Id.* at 34–35.

The Court sees no indication in the state court record that Plaintiffs requested leave to substitute the "Sworn and Binding Stipulation" exhibit to the Amended Petition with the "Post–Class Certification Sworn and Binding Stipulation." Thus, it would appear that pursuant to Federal Rule of Civil Procedure 10(c), the operative document to be considered as part of the Amended Petition is the first-filed "Sworn and Binding Stipulation." Where necessary throughout this Order, however, the Court will address any significant distinctions between the two documents in footnotes.

7. CAFA defines a "class action" as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons." 28 U.S.C. § 1332(d)(1)(B). The parties do not dispute that the present action is a "class action" as defined by CAFA.

8. CAFA additionally requires that the matter is a class action in which "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). The parties do not dispute that the minimal diversity provision is satisfied in this case because the Adamses are citizens of Iowa and American Family is a citizen of Wisconsin. *See* Notice of Removal (Clerk's No. 1) ¶ 9.

*Meridian Sec. Ins. Co. v. Sadowski,* 441 F.3d 536, 543 (7th Cir.2006)).

Notably, CAFA was "intended to expand substantially federal court jurisdiction over class actions." *See* S. Comm. on the Judiciary, Class Action Fairness Act of 2005, S.Rep. No. 109–14, at 41 (Feb. 28, 2005), *reprinted in* 2005 U.S.C.C.A.N. 3, 41, 2005 WL 627977 (hereinafter "Senate Report"). Accordingly, "[i]ts provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant." *Id.* Moreover, "if a federal court is uncertain about whether 'all matters in controversy' in a purported class action 'do not in the aggregate exceed the sum or value of $5,000,000,' the court should err in favor of exercising jurisdiction over the case." [9] *Id.*

## III.  ANALYSIS

### A.  *Has Defendant Proven by a Preponderance of the Evidence that the Amount in Controversy Exceeds $5 Million?*

█  Defendant recounts in its Notice of Removal four separate ways in which the $5,000,000 jurisdictional requisite is satisfied. *See* Notice of Removal (Clerk's No. 1) at 4–9. Plaintiffs counter in their Motion to Remand that the jurisdictional minimum cannot be satisfied in this action because Plaintiffs seek only declarative and injunctive relief, and because they filed a Post–Class Certification Sworn and Binding Stipulation that "damages will not be sought in this action greater than the jurisdictional minimum set forth in [CAFA]." *See* Clerk's No. 1–3 at 34. Thus, the sole matters for resolution at this time are whether the action was properly re-

moved to this Court pursuant to CAFA, and if so, whether Plaintiffs have proven to a legal certainty that the value of their claims falls below the jurisdictional threshold.

█  It has been long settled that "[i]n actions seeking declaratory or injunctive relief ... the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 347, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *James Neff Kramper Family Farm P'ship v. IBP, Inc.,* 393 F.3d 828, 833 (2005). Based on the Amended Petition, Plaintiffs' stated objective is that the Court enter a "declaratory judgment to the effect that Defendant has acted wrongfully and in violation of Iowa law by inserting the illegal binding arbitration clause into its [policies], thus depriving Iowa Policyholders of their right to appraisal" and enter a "mandatory injunction requiring that Defendant advise all Class members that they had a right to appraisal of their losses, under Iowa law, when they submitted claims under their homeowners or farm/ranch insurance policies." Am. Pet. ¶¶ 45, 56. In the Sworn and Binding Stipulation appended to the Amended Petition, Plaintiffs further articulate that they are requesting that the Court issue an "Order directing that the Defendant participate in the appraisal process to resolve the dispute between the Plaintiff class and the Defendant relating to the Plaintiff Class' claims under their homeowners insurance policies or farm and ranch insurance policies issued by Defendant." *Id.* Ex. 4 ¶ 2(b). The Court accordingly turns to an analysis of what value is appropriately assigned to these

---

9.  Plaintiff incorrectly cites the non-CAFA motion to remand standard, which provides that doubts about federal jurisdiction be resolved in favor of remand. *See* Pl.'s Br. at 7 ("All doubts about federal jurisdiction are resolved in favor of remand." (citing *Skoda v. Lilly USA, LLC,* 488 Fed.Appx. 161, 163 (8th Cir. 2012))); Pl.'s Reply Br. at 1 (same).

objectives for purposes of determining the amount in controversy.

### 1. *Defendant's first argument: estimation of value of claims post-appraisal.*

Defendant first argues that the amount in controversy requirement is satisfied because "Plaintiffs have explicitly requested an Order requiring American Family to 'participate in the statutory appraisal process' for each Class Member, and for each claim made during the class period, for the purpose of 'resolv[ing] the dispute(s) with all of them.' " [10] Defs.' Resp. to Pl.'s Mot. to Remand ("Def.'s Br.") at 4 (quoting Am. Pet. Ex. 4 ¶ 2(b)). According to Defendant, the proper way to calculate the value of such relief is to "use the estimated difference between benefits already *paid* and total benefits purportedly *owed* as the amount in controversy." *Id.* (citing cases). To determine the likely value of this estimated difference, Defendant recounts that there were 34,415 Iowa Policyholders who submitted 42,355 unique claims for benefits under homeowners or farm and ranch insurance policies during the class period, resulting in payments totaling $233,116,888.93. Notice of Removal at 5. Defendant further asserts:

> According to the affidavits of John Trave and Nicole Young ... appraisal has resulted in a significant increase in benefit payments over what was initially paid by American Family's adjusters. In Mr. Trave's case, he claims the actual cash valuations for his fire losses equaled $102,963.85 when figured by American Family's adjusters, but the actual cash valuations that resulted from a subsequent appraisal process were

$265,729.20, resulting in an additional payment of $162,765.35, or 158.08% of the original payment. In Ms. Young's case, she was paid approximately $75,800, but her appraisal resulted in an additional payment of $29,551.35, or 38.99% of the original payment. Based on Plaintiffs' own affidavits, they posit that the appraisal process will result in increased benefit payments to Class Members, and their examples suggest a possible range of increases between 38.99% and 158.08%.

*Id.* at 5–6. Defendant next contends that if each claim falling within the class period were submitted to appraisal and yielded a 38.99% increase in payments, this would result in well over $90 million in additional payments. *Id.* at 6. Even more conservatively, if each claim yielded a 2.2% increase in payments after appraisal, this would result in well over $5 million in additional payments. *Id.* Defendant claims that the amount in controversy would, therefore, be satisfied "if each Class Member received just under an additional $120.00 related to each claim through the appraisal process. Thus, the primary object of the litigation—the additional benefits Plaintiffs and the Class Members seek through the requested injunctive relief—easily and far exceeds $5,000,000." *Id.*

### 2. *Defendant's second argument: costs of appraisal.*

Defendant next argues that the jurisdictional threshold can be satisfied even without reference to any benefits class members might receive through the appraisal process. Notice of Removal at 6. "It can be and is met simply by taking into ac-

---

**10.** This reference is to the "Sworn and Binding Stipulation" that comprises part of the Amended Petition rather than the later-filed "Post–Class Certification Sworn and Binding Stipulation" filed on May 1, 2013. *See supra*

n. 6. The latter document requests simply that the Court issue an "Order directing that the Defendant offer to each member of the Class an *opportunity* to participate in an appraisal process." *Id.* (emphasis added).

count the estimated costs of American Family 'participating in the appraisal process' with each purported Class Member." *Id.* Specifically, Defendant provides the affidavit of Joe Corcoran, an American Family claims administrator, who attests that Defendant incurred $7,288.30 in costs payable to third parties related to Trave's appraisal and $3,909.50 in costs payable to third parties related to Young's appraisal. Corcoran Aff. (Clerk's No. 20) ¶¶ 11–12. Using the average third-party costs of these two claims—$5,598.90—Defendant extrapolates that if all 42,348 unique claims during the relevant time period were submitted to appraisal, Defendant would incur $237,102,217.20 in third party costs associated therewith. Notice of Removal at 7. Even using the lower of the two known costs—the $3,909.50 expenditure for Young—Defendant would still potentially face well over $165 million in appraisal related costs. *Id.*

### 3. *Defendant's third argument: Plaintiffs' tort claim.*

Defendant's third argument is that Plaintiffs' bad faith tort claim requires proof of damages as an essential element. Notice of Removal at 8. "As Plaintiffs' stipulation eschewing any damages cannot operate to bind absent Class Members, Plaintiffs theoretically may be entitled to damages in the amount [of any increased award determined to be payable through the appraisal process]." *Id.* (internal citations omitted). Although Defendant does not further expound on this allegation in its Resistance Brief, Plaintiffs' counsel stated at hearing that, should the Court make a finding that Defendant acted in bad faith by improperly removing

the appraisal provision from the relevant insurance policies, "the bad faith—extra contractual damages would also be determined in the appraisal process if they're in the case." Hr'g Tr. (Clerk's No. 36) at 23.

### 4. *Defendant's fourth argument: attorney fees.*

Defendant's final argument that the amount in controversy is satisfied rests on the assertion that "it can easily be foreseen that Plaintiffs will seek attorneys' fees in excess of the $5,000,000 jurisdictional threshold under CAFA." Notice of Removal at 8. According to Defendant, if Plaintiffs are successful in this action, "their attorneys' fees request will likely exceed $5,000,000 quite apart from any other relief awarded by this Court." *Id.* Defendant further claims that, even assuming that Plaintiffs' counsel are bound by their Stipulation that "the [attorney fee and litigation cost] award that is sought will not exceed $4.5 million under any circumstances" (Am. Pet. Ex. 4), "Plaintiffs effectively acknowledge that the amount of attorneys' fees sought will likely be as high as $4,500,000, which would therefore easily satisfy the amount in controversy when combined with the value of the injunctive relief Plaintiffs seek on behalf of the Class Members or other amounts described herein."[11] Notice of Removal at 9.

### 5. *Plaintiffs' resistance.*

Plaintiffs counter that, because they only seek declaratory and injunctive relief, and because they have expressly disclaimed traditional monetary damages as part of the present lawsuit, Defendant's asserted amount in controversy calculation

---

**11.** In their Brief in support of Remand, Plaintiffs reference the "Post–Class Certification Sworn and Binding Stipulation, *see supra* n. 6, in emphasizing that they will not seek more than $4.9 million [as opposed to $4.5 million]

in total damages, including attorney's fees and litigation costs, "under any circumstances." Pl.'s Mem. in Supp. of Mot. to Remand at 16; *see also supra* n. 6.

is little more than a " 'speculative allegation[ ] of *indirect, non-pecuniary benefits* [that] may not be used to meet the amount in controversy requirement.' " Pl.'s Mem. in Supp. of Mot. to Remand ("Pl.'s Br.") (Clerk's No. 17–1) at 9 (quoting *Hatridge v. Aetna Cas. & Sur. Co.,* 415 F.2d 809, 815 (8th Cir.1969) (emphasis added by Plaintiffs)). More specifically, Plaintiffs argue that the Eighth Circuit's *Hatridge* decision holds that "the 'test for determining the amount in controversy is the *pecuniary result* to either party which the judgment would *directly* produce.' " *Id.* at 6. (quoting *Hatridge,* 415 F.2d at 815 (emphasis added by Plaintiffs)). According to Plaintiff, since the appraisal process is a non-judicial proceeding that will occur, if at all, only

after this lawsuit concludes, there is zero chance that the *this case* will *directly* produce a monetary benefit to Plaintiffs or a monetary detriment to Defendant. Stated another way, Plaintiffs urge that if any monetary award should be granted to any class member as a result of appraisal, such benefit would solely be the result of an extrajudicial proceeding; it would not be the result of *this* action, regardless of whether it ultimately proceeds in federal or state court.[12]

Plaintiffs further emphasize that their view on calculating the amount in controversy is "far more sensible as it requires no speculation." Pl.'s Br. at 15. Indeed, at hearing, Plaintiffs' counsel summarized their argument as follows:

12. Plaintiffs do not dispute that the *Hatridge* standard upon which they rely predates CAFA by thirty-five years. They nonetheless argue that its "commonsense standard has survived the passage of time." Pl.'s Br. at 8. According to Plaintiff, the " 'direct-pecuniary benefit' standard has been applied to recent CAFA cases on point with this case." *Id.* at 9. In particular, Plaintiff cites *Ramirez v. HMS Host USA, Inc.* for the proposition that "costs associated with potential future compliance with an injunction are *incidental costs,* and should not be included in an amount in controversy analysis." *Id.* at 9 (citing *Ramirez v. HMS Host USA, Inc.,* No. 5:12–cv–04683, 2012 WL 6000565, at *5 (N.D.Cal. Nov. 30, 2012)). "Therefore, according to *Ramirez,* a valuation of injunctive relief sought by the plaintiff in a CAFA case is not includable." *Id.*

The Court finds *Ramirez* unconvincing. First, as articulated *infra, Ramirez* is wholly inconsistent with CAFA's intent that an amount in controversy calculation include the value of all benefits that "logically flow" from a grant of declaratory or injunctive relief. *See* Senate Rep. at 41. Second, *Ramirez's* conclusion that the costs of complying with an injunction are "incidental" and, therefore, not to be considered in an amount in controversy analysis conflicts with compelling case law from other courts that have considered the issue. *See, e.g., Republic Bank & Trust Co. v. Kucan,* 245 Fed.Appx. 308, 314 (4th Cir.

2007) ("[T]he cost ... of complying with the injunction would be an appropriate consideration when determining whether the amount-in-controversy requirement has been met."); *Rubel v. Pfizer Inc.,* 361 F.3d 1016, 1017 (7th Cir.2004) ("[T]he cost to the defendant of complying with an injunction counts toward the jurisdictional minimum."); *Lovell v. State Farm Mut. Auto. Ins. Co.,* 466 F.3d 893, 898 (10th Cir.2006) ("[A] court may look to the compliance costs of a defendant in multiple plaintiff cases to determine the amount in controversy."); *In re Corestates Trust Fee Litig.,* 39 F.3d 61, 65 (3d Cir.1994) (finding that courts should determine the amount in controversy in claims for injunctive relief by calculating "the value of the right sought to be protected by the equitable relief"). Third, *Ramirez,* along with the other CAFA cases cited by Plaintiff on this issue, was premised on a legal standard that has been expressly rejected by the Eighth Circuit, that is, the Ninth Circuit's requirement in *Lowdermilk v. U.S. Bank National Association,* 479 F.3d 994, 1000 (9th Cir.2007), that when a plaintiff disavows damages above the jurisdictional threshold, the burden is on the removing party to prove to a *legal certainty* that the amount in controversy is satisfied. *See Bell,* 557 F.3d at 957 (rejecting *Lowdermilk* as a "depart[ure] from our non CAFA precedent where we have only required a removing party to establish jurisdictional facts by a preponderance of the evidence").

The question is whether you look at the amount in controversy at the end of all the appraisal process, or whether you look at the amount in controversy at the end of the court case. And we think what you should consider in making your decision is which is the more certain case, which situation involves less speculation. And we respectfully submit that if you adopt our position, that it involves no speculation.

Hr'g Tr. at 24–25.

6. *Conclusion.*

Plaintiffs' attempt to limit the value of their requested injunctive and declaratory relief to results *directly* produced by a judgment in *this* case conflicts with the intent of CAFA, as articulated in the Report of the Senate Committee on the Judiciary on CAFA, which provides:

[T]he Committee intends that a matter be subject to federal jurisdiction under this provision if the value of the matter in litigation exceeds $5,000,000 either from the viewpoint of the plaintiff or the

viewpoint of the defendant, *and regardless of the type of relief sought (e.g., damages, injunctive relief, or declaratory relief*). The Committee is aware that some courts, especially in the class action context, have declined to exercise federal jurisdiction over cases on the ground that the amount in controversy in those cases exceeded the jurisdictional threshold only when assessed from the viewpoint of the defendant.... [These courts reasoned] that assessing the amount in controversy from the defendant's perspective was tantamount to aggregating damages.[13] Because [CAFA] explicitly allows aggregation for purposes of determining the amount in controversy in class actions, that concern is no longer relevant. [I]n assessing the jurisdictional amount in declaratory relief cases, the federal court should include in its assessment the value of all relief and benefits *that would logically flow* from the granting of the declaratory relief sought by the claimants. For example, a declaration that a defendant's conduct is unlawful or fraud-

---

**13.** The Eighth Circuit is one such court, having historically held that the value of injunctive relief for purposes of the amount in controversy is determined by analyzing the "value *to the plaintiff* of the right sought to be enforced." *Burns v. Mass. Mut. Life Ins. Co.,* 820 F.2d 246, 248 (8th Cir.1987) (emphasis added); *see also Smith v. Am. States Preferred Ins. Co.,* 249 F.3d 812, 813–14 (8th Cir.2001) ("Our own circuit precedent requires the district court to rely solely on the plaintiff's viewpoint in meeting the requisite amount."); *Mass. State Pharm. Ass'n v. Fed. Prescription Serv., Inc.,* 431 F.2d 130, 132 (8th Cir.1970) ("The amount in controversy is tested by the value of the suit's intended benefit to the plaintiff.").

Although the Eighth Circuit has not addressed the continuing viability of the "plaintiff's viewpoint" principle under CAFA, at least one district court in this circuit has determined that the rule is no longer tenable under CAFA. *See Toller v. Sagamore Ins. Co.,* 558 F.Supp.2d 924, 930–31 (E.D.Ark.2008)

("Traditionally, the Eighth Circuit has held that a district court must rely solely on the plaintiff's viewpoint in determining the amount in controversy. Courts refused to consider the cost of injunctive relief to the defendant because that would effectively aggregate the plaintiffs' claims to satisfy the amount in controversy, which plaintiffs were not allowed to do. However, after those cases were decided, Congress adopted [CAFA], which requires that the claims of Class action plaintiffs be aggregated in determining whether jurisdictional minimum of $5,000,000 is met. The adoption of this provision requiring aggregation of the plaintiffs' claims is inconsistent with the old rule that required that the amount in controversy be viewed solely from the plaintiff's viewpoint. In determining the amount in controversy under [CAFA], the value of injunctive relief should probably be considered from either the plaintiffs' or the defendant's point of view." (quotations and citations omitted)).

ulent will carry certain consequences, such as the need to cease and desist from that conduct, that will often "cost" the defendant in excess of $5,000,000. Or a declaration that a standardized product sold throughout the nation is "defective" might well put a case over the $5,000,000 threshold, even if the class complaint did not affirmatively seek a determination that each class member was injured by the product. Senate Report at 41. In this case, the Court must agree with Defendant that Plaintiffs are attempting to "create an artificial distinction between the relief they seek ... and the *value* of that relief." Def.'s Br. at 3.

Plaintiffs emphasize that the "object of this litigation is nothing more or less than an opportunity for class members to participate in the appraisal process if they individually elect to do so." Pl.'s Br. at 13; *see also id.* at 10 ("Thus, if the Plaintiffs are 100% successful in obtaining relief for the class, the class will receive not one penny, but will gain an opportunity to use the appraisal remedy to have American Family's assessment of their loss reevaluated."). This attempt to circumscribe the "object" of the litigation to exclude the practical and monetary effects of the relief sought, however, strains credulity. Indeed, substantial pecuniary costs to Defendant are virtually certain to "logically flow" from requiring it to provide the opportunity to participate in the appraisal process to 34,415 class members with 42,-

355 separate claims.[14] *See Cox v. Allstate Ins. Co.*, No. 07–1449, 2008 WL 2167027, at *3 (W.D.Okla. May 22, 2008) ("Where plaintiffs seek injunctive relief, 'the amount in controversy is measured by the value of the object of the litigation.' That value, in turn, is determined by 'the pecuniary effect an adverse declaration will have on either party to the lawsuit.' " (citations omitted)); *Rodgers v. Cent. Locating Serv.*, 412 F.Supp.2d 1171, 1179–80 (W.D.Wash.2006) ("[T]he value of injunctive relief is determined by calculating the defendant's costs of compliance: where the value of a plaintiff's potential recovery is below the jurisdictional amount, but the potential cost to the defendant of complying with the injunction exceeds that amount, it is the latter that represents the amount in controversy for jurisdictional purposes." (citation omitted)). Such pecuniary costs would unquestionably include expenses incurred by Defendant should class members opt to participate in an appraisal, and monetary awards to Plaintiffs who actually participate in the appraisal process and who are, like Young and Trave, successful in obtaining an increased valuation of and payout on their claims. As Defendant aptly points out, "[w]hether additional benefit payments come in the form of court-ordered damages or as the result of a court-ordered appraisal process ... they are still additional benefit payments that flow directly from a court order. Refusing to call those benefits damages does not change the fact

**14.** The "opportunity to participate" language is found in the "Post–Class Certification Sworn and Binding Stipulation." *See supra* n. 6. The Court's conclusion that substantial pecuniary results will logically flow from granting Plaintiffs the relief they seek, however, is only bolstered when using the language from the "Sworn and Binding Stipulation" that comprises part of the Amended Petition. In that document, Plaintiffs request that the Court issue an "Order *directing that the De-*

*fendant participate in the appraisal process.*" (emphasis added). There can be no doubt that requiring Defendant to participate in the appraisal process with all class members would result in a cost to Defendant vastly in excess of the jurisdictional threshold. Indeed, if Defendant participated in the appraisal process with all 34,415 class members, it would only need incur approximately $145.29 in expenses per person to exceed the $5 million requirement.

that they are in controversy in this litigation." Def.'s Br. at 9.

The Court can find no case law directly on point, but several cases are at least somewhat instructive and support the Court's conclusion that costs incurred by a defendant in complying with an injunction or declaratory judgment, including the "gap" between the parties' calculations of benefits owed, constitute appropriate considerations in determining the amount in controversy. For instance, in *Bernert v. State Farm Fire and Casualty Co.*, an insured filed suit against her insurer "seeking to invoke an appraisal provision in a homeowner's insurance policy..... Through this appraisal procedure, Plaintiff sought to resolve a dispute with Defendant concerning the appropriate amount of insurance benefits owed to her as a result of water damage sustained to her home." No. 10–12359, 2012 WL 1060089, at *1 (E.D.Mich. Mar. 29, 2012). The insurer removed the action to federal court claiming that the jurisdictional amount in controversy was satisfied by using the first methodology proposed by Defendant—the gap in the benefits claimed to be owed by the parties. *Id.* (noting that the amount in controversy was satisfied "by virtue of a difference of over $90,000 in the parties' estimates of the cost to repair the damage to Plaintiff's residence"). *Id.* Although the propriety of the removal was never directly addressed in the case, the court appears to have accepted, without comment, the insurer's method for determining the amount in controversy.[15] *See generally id.*

Likewise, in *Rasberry v. Capitol County Mutual Fire Insurance Co.*, a class of Texas Homeowners sued their insurer claiming that it had systematically and pervasively mishandled their Hurricane Rita damage claims. 609 F.Supp.2d 594, 598 (E.D.Tex.2009). As in the present case, the class sought *only* injunctive and declaratory relief suspending the statute of limitations and preventing the insurer from asserting the statute of limitations as a defense until each claim was evaluated by a licensed adjuster. *Id.* at 598–99. The class challenged the insurer's removal of the action to federal court under CAFA, claiming that since their class action petition made no claim for monetary recovery, the insurer could not satisfy the amount in controversy requirement. *Id.* at 600. Noting that CAFA was intended to be "interpreted expansively, and its provisions read broadly, with a strong preference for federal jurisdiction," the *Rasberry* court found that removal was proper. *Id.* at 601 (citing Senate Rep. at 42–43). In particular, the court found that "one realistic measure of the value of all relief and benefits that could logically flow from the granting of the declaratory relief sought by claimants is the remaining limits" on the insurance policies, i.e., since the plaintiff class claimed that the defendant mishandled *all* claims generated by the hurricane, the proper amount in controversy was the "value of the underlying claim," measured by the difference between the amount actually paid and the maximum policy limit. *Id.* at 601–02.

In *Toller v. Sagamore Insurance Co.*, an insured brought a class action suit against an insurer claiming that the insurer failed to inform purchasers of the availability of uninsured motorist coverage, underinsured motorist coverage, medical benefits, and income disability benefits or accidental death benefits, and also failed to provide them the opportunity to reject such coverage, both as required by Arkansas law.

---

**15.** Plaintiff urges that *Bernert* is inapposite because it was not a CAFA case. While true, the fact remains that many considerations from "ordinary" removal cases are useful in analyzing CAFA cases.

558 F.Supp.2d 924, 927 (E.D.Ark.2008). The parties disputed whether the insurer's removal of the action was proper and proposed a variety of methodologies for determining whether CAFA's jurisdictional threshold was satisfied. *Id.* at 928–30. Noting that the "value of the object of the litigation is determined by the value to the plaintiff of the right sought to be enforced," the court ultimately found that the amount in controversy was sufficient for jurisdiction from the vantage point of the defendant because the insurer demonstrated that it would have charged over $10,000,000 in premiums had it provided the required coverage to all class members. *Id.* at 930–31 (quoting *Burns v. Mass. Mut. Life Ins. Co.*, 820 F.2d 246, 248 (8th Cir.1987)). Contrary to Plaintiffs' assertions,[16] the lesson to be learned from *Toller* is not that premiums are the appropriate measure of the amount in controversy; rather, *Toller* emphasized that when an "action involves the applicability of the policy to a particular occurrence, the amount in controversy is measured by the value of the underlying claim."[17]  *Id.* at 930.

After consideration of all case law cited by the parties, the hearing transcript, and the entire record before it, the Court must conclude that Defendant has demonstrated by a preponderance of the evidence that the amount in controversy in this action exceeds $5 million, exclusive of interest and costs. Specifically, the Court finds that if Plaintiffs are awarded the declaratory and injunctive relief they seek, Defendant is likely to face pecuniary costs that logically flow from such relief in amounts exceeding $5 million. Such amounts include, at a minimum,[18] appraisal costs,[19] benefit payments that may be awarded through the appraisal process,[20] and attor-

16. Plaintiff argues that Defendant cannot rely on *Toller* because it has not provided any proof that it would have charged additional premiums to class members had it properly included an appraisal provision in the policies. Pl.'s Br. at 14–15. *Toller* did not, however, hold that a premium differential was the *only* appropriate measure of the amount in controversy. *See Toller*, 558 F.Supp.2d at 931 (noting that because the premium increase was sufficient, the court "need not reach the issue of whether the face amount of the coverages [could be] the appropriate measure of the amount in controversy").

17. *Toller* also stated that the "amount in controversy is the face value of the policy" when the action involves a question on the "validity of the entire contract between the parties." *Toller*, 558 F.Supp.2d at 930. While the present action does not fit neatly into either of the two *Toller* categories, the Court finds that it more appropriately fits into the "applicability of the policy" category than in the "validity of the entire contract" category.

18. The Court does not find it necessary to undertake significant analysis of the likely pecuniary cost to Defendant of a declaratory judgment that they acted in bad faith by failing to provide an appraisal provision in its policies. Suffice it to say, such declaratory judgment would likely create a substantial pecuniary burden on Defendant that logically flows from the present suit, given that successful bad faith claims can lead to both actual and punitive damages awards. *See generally Buhmeyer v. Case New Holland, Inc.*, 446 F.Supp.2d 1035 (S.D.Iowa 2006).

19. For instance, if even 5%, or 1721 of the 34,415 class members opted for appraisal, Defendant would only need incur appraisal costs of approximately $2905.29 per person to meet the jurisdictional requisite without consideration of any other potential costs such as attorney fees. Since the costs of the Trave and Young appraisals both exceeded this amount and are the only known estimations of appraisal costs on the record, this record is sufficient to meet Defendant's burden on this item alone. *See* Corcoran Aff. (Clerk's No. 20) ¶¶ 11–12 (attesting the costs of the Trave and Young appraisals were $7,288.30 and $3,909.50, respectively).

20. Assuming that even 5% of class members are granted an increased benefit payment

neys fees.[21] Since Defendant has "explained plausibly how the stakes [in this action] exceed $5 million ... 'the case belongs in federal court unless [Plaintiffs prove] it is legally impossible for [them] to recover that much.'" *Raskas v. Johnson & Johnson*, 719 F.3d 884, 888 (8th Cir.2013) (quoting *Spivey*, 528 F.3d at 986).

B. *Have Plaintiffs Demonstrated to a Legal Certainty that the Value of Their Claims is Less than the Jurisdictional Threshold?*

■ Since Defendant has adequately demonstrated that the jurisdictional minimum is satisfied in this case, the burden now shifts to Plaintiffs to "establish to a legal certainty that th[eir claims are] for less than the requisite amount." *Bell*, 557 F.3d at 956. To this end, Plaintiffs contend that the Post–Class Certification Sworn and Binding Stipulation is dispositive of the amount in controversy. Pl.'s Br. at 7 (citing *Rolwing v. Nestle Holdings, Inc.*, 666 F.3d 1069, 1072 (8th Cir. 2012)); *see also* Pl.'s Reply Br. at 6.

In *Rolwing*, the plaintiff attempted to avoid removal under CAFA by including in his complaint a statement that "Plaintiff and the class do not seek—and will not

accept—any recovery of damages ... *and any other relief, in total,* in excess of $4,999,999." 666 F.3d at 1071. The Eighth Circuit found the plaintiff's disclaimer effective, concluding that "a binding stipulation limiting damages ... can be used to defeat CAFA jurisdiction.... Stipulations of this sort, when filed contemporaneously with a plaintiff's complaint and not after removal, have long been recognized as a method of defeating federal jurisdiction in the non-CAFA context." *Id.* at 1072.

*Rolwing* was abrogated by *Standard Fire Ins. Co. v. Knowles*, —— U.S. ——, 133 S.Ct. 1345, 185 L.Ed.2d 439 (2013). In *Standard*, as in *Rolwing*, the plaintiff included with his complaint a stipulation that he would "not at any time during this case ... seek damages for the class ... in excess of $5,000,000 in the aggregate." *Id.* at 1347. The Supreme Court rejected the plaintiff's attempt to avoid CAFA jurisdiction, finding that a *pre-class certification stipulation* only tied the hands of the named plaintiff and does not speak for those the named plaintiff purports to represent "because a plaintiff who files a proposed class action cannot legally bind

through the appraisal process, each would only need receive an additional $2905.29 in payments to meet the jurisdictional requisite without consideration of any other potential costs such as attorney fees. Since the additional benefits to Trave and Young are the only known estimations of additional benefit payments achievable through the appraisal process, this record is sufficient to meet Defendant's burden on this item alone. *See* Am. Pet. Exs. 2, 3 (providing that Trave and Young were awarded $157,742.91 and $29,551.35, respectively, in additional payments after appraisal).

21. Defendant contends that, in spite of Plaintiffs' stipulation, a court *could* award Plaintiffs attorney fees in excess of $5 million for this type of class litigation. Def.'s Br. at 16–18. Plaintiffs do not actually dispute that a

substantial award is likely, but urge that it would be, at most, $4.9 million in light of their Post–Class Certification Sworn and Binding Stipulation. *See* Pl.'s Br. at 16–17. Accordingly, the amount in controversy by virtue of a potential attorneys' fees award alone is $4.9 million. This means that Defendant only need show $100,000.01 in other pecuniary costs logically flowing from Plaintiffs' requested injunctive and declaratory relief to support removal under CAFA. Assuming the same 5% appraisal participation *and* success rate as in footnotes 17 and 18, Defendant could satisfy this burden with a mere $58.11 expenditure per participating class member. On the record before it, Defendant has unquestionably satisfied its burden to show that a reasonable factfinder *could* conclude that the pecuniary cost to Defendant will exceed $5 million. *See Kopp*, 280 F.3d at 885.

members of the proposed class before the class is certified." *Id.* at 1349. Thus, because the plaintiff in *Knowles* "lacked authority to concede the amount in controversy for absent class members, the District Court wrongly concluded that his stipulation could overcome its finding that the CAFA jurisdictional threshold had been met." *Id.*

Plaintiff urges that the present case is distinguishable from *Knowles* because here, Plaintiffs filed a binding stipulation disclaiming damages in excess of $5 million *after* the class had already been certified. *See* Pl.'s Br. at 7 (noting that because the stipulation was filed after certification, "the plaintiffs were the representatives of the declaratory and injunctive relief class and had authority to bind the class"). Although the Court acknowledges that this case differs from *Knowles,* it nonetheless must conclude that Plaintiffs' Post–Class Certification Sworn and Binding Stipulation does not demonstrate to a legal certainty that the amount in controversy is below CAFA's jurisdictional minimum. First, for reasons explained *supra,* the Court has already rejected Plaintiffs' assertion that costs of appraisal and benefits awarded in the appraisal process are not properly considerable in the Court's amount in controversy analysis. Since Plaintiffs' Post–Class Certification Sworn and Binding Stipulation neither contradicts the likely expenses Defendant will incur by virtue of the appraisal process nor disclaims an entitlement to benefits during the appraisal process, it is ineffective to limit the overall amount in controversy in this case.[22] Second, as Defendant points out, Plaintiffs only stipulate in their Post–Class Certification Sworn and Binding Stipulation that they will not "seek" an

award that exceeds $4.9 million"; they do not state that they would decline to *accept* an award in excess of that amount should the Court find such an award appropriate. *See* Def.'s Br. at 17. Accordingly, even if Plaintiffs were correct that costs and awards from a later appraisal process do not comprise part of the amount in controversy in this case, they have still failed to prove to a legal certainty that all other damages in this case *could* not exceed the jurisdictional threshold.

## IV.  CONCLUSION

For the reasons stated herein, the Court finds that this action was properly removed to federal court pursuant to CAFA. Accordingly, Plaintiffs' Motion to Remand (Clerk's No. 17) is DENIED.

IT IS SO ORDERED.

---

22. Indeed, Plaintiffs' Post–Class Certification Sworn and Binding Stipulation expressly states that the Plaintiffs *"will* seek an individual award of compensatory and bad faith damages." Pl.'s App. at 53 (emphasis added). Such damages would unquestionably "logically flow" from an entry of injunctive or declaratory relief in this action.